# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | Case No.  2:23-cv-1408 |
| Plaintiff, | : | |
| v. | : | |
| **FIFTEEN THOUSAND ONE HUNDRED FOUR AND 00/100 DOLLARS ($15,104.00) IN UNITED STATES CURRENCY,** | : | **VERIFIED COMPLAINT FOR FORFEITURE IN REM** |
| **Defendant 1,** | : | |
| and | : | |
| **TEN THOUSAND FIVE HUNDRED TWELVE AND 00/100 DOLLARS ($10,512.00) IN UNITED STATES CURRENCY,** | : | |
| **Defendant 2.** | : | |

Plaintiff, United States of America, by its undersigned counsel, alleges the following for its action against the defendants in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure.

## NATURE OF THE ACTION

1. This is a civil action *in rem* brought to enforce 21 U.S.C. § 881(a)(6), which provides for the forfeiture to the United States of:

> All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

## THE DEFENDANTS IN REM

2. Defendant 1 is Fifteen Thousand One Hundred Four and 00/100 Dollars ($15,104.00) in United States Currency. The Drug Enforcement Administration ("DEA") seized Defendant 1 on or about January 10, 2023, from Imani Robinson's carry-on bag, following a consensual encounter with her at the John Glenn Columbus International Airport. Defendant 1 has been deposited into the Seized Asset Deposit Fund, where it will remain during the pendency of this action.

3. Defendant 2 is Ten Thousand Five Hundred Twelve and 00/100 Dollars ($10,512.00) in United States Currency. The DEA seized Defendant 2 on or about January 10, 2023, from Imani Robinson's checked luggage, following a consensual encounter with her at the John Glenn Columbus International Airport. Defendant 2 has been deposited into the Seized Asset Deposit Fund, where it will remain during the pendency of this action.

## JURISDICTION AND VENUE

4. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendants under 21 U.S.C. § 881(a)(6). This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345 and over an action for forfeiture under 28 U.S.C. § 1355(a).

5. This Court has *in rem* jurisdiction over the defendants under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of Ohio.

6. Venue is proper in this district under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of Ohio and under 28 U.S.C. § 1395 because the defendants were found in the Southern District of Ohio.

**BASIS FOR FORFEITURE**

7. The defendants are subject to forfeiture under 21 U.S.C. § 881(a)(6) because they represent property furnished or intended to be furnished in exchange for a controlled substance, represent proceeds traceable to such an exchange, or were used or intended to be used to facilitate any violation of 21 U.S.C. § 841 or a conspiracy to commit such offense, in violation of 21 U.S.C. § 846.

**FACTS**

8. On or about January 10, 2023, members of the Columbus, Ohio Airport DEA Group at the John Glenn Columbus International Airport ("CMH") received information regarding the suspicious travel of airline passengers identified as Imani Robinson ("Robinson") and Trent Messer ("Messer").

   a. Members of the Columbus, Ohio Airport DEA Group are trained and experienced and know that persons engaged in the commercial interstate distribution of controlled substances frequently use CMH and the aircraft that arrive and depart there to transport drug sales proceeds and funds to be used to purchase drugs in and out of Columbus. Those proceeds and funds are usually in the form of United States currency.

   b. Members of the Columbus, Ohio Airport DEA Group are trained and experienced and know that persons engaged in the commercial interstate distribution of controlled substances frequently use couriers to transport controlled substances, drug sales proceeds, and funds to be used to purchase drugs in and out of Columbus. CMH and the aircraft that arrive and depart there are relied upon as a means of sending and receiving such couriers.

  c. Members of the Columbus, Ohio Airport DEA Group are trained and experienced in investigating illegal drug and drug currency couriers, and they have learned to observe and detect the behavior, characteristics, and other travel indicators which help them to distinguish suspected illegal drug and drug currency couriers from the normal, non-criminal traveling public.

  d. Members of the Columbus, Ohio Airport DEA Group are trained and experienced and know that illegal drug and drug currency couriers often purchase airline tickets within 72 hours of travel to a known source area for illegal drugs like Los Angeles, California, or to a known destination area for illegal drugs like Columbus, Ohio. The members of the Columbus, Ohio Airport DEA Group also know that illegal drug and drug currency couriers often purchase "quick-turn" trips, which are trips with short stays in narcotic source and/or destination areas, as the nature of their business does not require more than a quick drop-off or pick-up.

  e. DEA Special Agent Jonathan Hanley ("SA Hanley"), DEA Task Force Officer Andrew D'Orazio ("TFO D'Orazio"), DEA Task Force Officer Eric Doyle ("TFO Doyle"), and DEA Task Force Officer Raul Melo ("TFO Melo") are members of the Columbus, Ohio Airport DEA Group.

9. The investigators learned that on January 9, 2023, round-trip tickets were purchased together via the Expedia travel company for Robinson and Messer to fly from Columbus, Ohio to Los Angeles, California on January 10, 2023, and returning on January 11, 2023 to Columbus, Ohio.

10. Upon reviewing the reservation, investigators learned that Robinson and Messer were set to depart from the CMH on January 10, 2023, at 2:26 p.m. est., on Spirit Airlines Flight

4

#NK-889. The flight was scheduled to arrive at the Los Angeles International Airport ("LAX") at 4:30 p.m. pst. Investigators also observed that Robinson and Messer were scheduled to be in California for approximately 13 1/2 hours as they were booked to return to Columbus, Ohio the next morning on January 11, 2023, at 6:00 a.m. pst., on Spirit Airlines Flight #NK-888.

11. Finally, investigators noted that the reservation for Robinson and Messer's flight cost $757.56.

12. After reviewing this information, the investigators decided to speak to Robinson and Messer about their travel.

13. Prior to approaching Robinson and Messer, the investigators were provided confirmation of who Robinson and Messer were and learned that the luggage they had checked appeared to be mostly empty.

14. At approximately 2:25 p.m. est., on January 10, 2023, SA Hanley along with TFO D'Orazio and TFO Melo observed Robinson and Messer go through the CMH Transportation Security Administration's ("TSA") Checkpoint B. The investigators were in plain clothes with no weapons or badges displayed.

15. The investigators noted that Robinson and Messer were each carrying a backpack style carry-on bag with them.

16. After Robinson and Messer cleared the TSA screening area, the investigators approached them in a way as not to block their freedom of movement. The investigators identified themselves as a law enforcement officers and asked Robinson and Messer if they would speak with the officers. Robinson and Messer each agreed to speak to the investigators.

17. After receiving consent, SA Hanley and TFO Melo spoke with Robinson while TFO D'Orazio spoke with Messer.

18. TFO Melo advised Robinson that she was not in trouble or being detained and asked her for the reason for her travel and why she had purchased a ticket the day before her flight. Robinson replied that she was going to Los Angeles, California to "hang out." Robinson did not explain the late ticket purchase.

19. TFO Melo then asked Robinson when she was returning to Ohio. Robinson responded, "oh, I don't know." After hearing this, TFO Melo asked Robinson how much time she would be spending in Los Angeles, California. Robinson advised that she was not sure.

20. After learning all this, TFO Melo asked Robinson if she was carrying any illegal contraband, such as illegal narcotics, or if she was carrying large amounts of United States Currency. Robinson stated that she was not and offered for the officers to check.

21. Upon searching Robinson's backpack with consent, SA Hanley observed two large bundles of United States Currency. After finding the currency, investigators asked Robinson what it was for. Robinson advised that it was "just travel money." TFO Melo asked Robinson how much currency was in her backpack and if she had any more currency in her checked bag. Robinson stated there was about $10,000.00 in her backpack and that there was another $10,000.00 in an inside pocket of her checked bag. After hearing this, TFO Melo asked Robinson what she planned to purchase that was so expensive. Robinson did not respond.

22. After learning that Robinson was carrying a large amount of currency in her checked bag, TFO Melo asked Robinson for consent for an officer to search her checked bag. Robinson consented.

23. At this time, TFO Doyle searched Robinson's checked bag and located the additional currency mentioned by Robinson. TFO Doyle also discovered a large FoodSaver brand vacuum sealer in Robinson's checked bag.

24. While searching Robinson's checked bag, TFO Doyle noted that there appeared to be only one pair of pants and that a strong odor of raw marijuana was emitting from the bag. Based upon his training and experience, TFO Doyle also noted that the large size of Robinson's checked bag was inconsistent with someone who was on such a quick trip.

25. After learning that Robinson's checked bag contained a vacuum sealer, TFO Melo asked Robinson why she had the item in her checked bag. Robinson did not respond.

26. At this time, TFO Melo asked Robinson what the true purpose of her trip was. Robinson then advised that she and others "go in together on purchasing cars" and that "we" might purchase a car. She also stated that her brother's parents had died and that she was going to spend time with him. The investigators asked what her brother's name was. Robison took some time to respond and appeared to the investigators to be trying to remember. She then stated that he was not her true brother; that he was a friend known to her only as "JDot."

27. TFO Melo then asked Robinson what she did for a living. Robinson advised that she worked in a factory in the Dayton, Ohio, where she lived. When asked later how much money she made per year, Robinson did not answer.

28. TFO Melo asked Robinson if she had proof as to where all the money in her bags came from, such as proof of deposits or withdrawals from a bank. Robinson advised that she did not have a bank account, and that she cashes her checks when she gets paid.

29. Based on this investigation and TFO Melo and SA Hanley's training and experience, the investigators suspected that Robinson was involved in illegal narcotics activity and that the currency in her bags was related to this illegal activity.

30. TFO Melo advised Robinson that he knew what she was up to and advised her that she needed to stop. Robinson responded that she knew that TFO Melo knew what was going on.

TFO Melo then asked Robinson who all the money belonged to. Robinson stated "it is all my money."

32. TFO Melo and SA Hanley then advised Robinson that the currency located in her carry-on backpack and checked luggage was being administratively seized as drug proceeds. The investigators also advised Robinson that her cellular telephone would be seized for further investigation. The investigators took custody of the currency and cellular telephone and provided Robinson with a custody receipt form for the property.

32. As part of this investigation, TFO D'Orazio talked to Robinson's travel companion Messer while TFO Melo and SA Hanley were talking to Robinson. Upon approaching Messer, TFO D'Orazio noted that he smelled a strong odor of marijuana coming from Messer's body.

33. When asked about his travel, Messer told TFO D'Orazio that he and "his sister" were going to California "to smoke." When TFO D'Orazio asked him what he meant by that, Messer stated that they were going to California to smoke marijuana because it was legal there. When asked if he had any marijuana on him during the interview, Messer stated that he did not but admitted that he and Robinson smoked marijuana before arriving at the airport.

34. When asked about the length of his trip, Messer advised that he and Robinson were staying in California for two days. TFO D'Orazio recognized that their flight reservation had them returning to Columbus, Ohio the next morning.

35. When asked, Messer denied that he was carrying any illegal narcotics or large amounts of United States Currency and consented to a search his person, his carry-on backpack, and his checked luggage.

36. During the search of Messer's backpack, TFO D'Orazio noticed a strong odor of marijuana was emitting from the bag.

8

37. During the search of Messer's checked bag, TFO Doyle discovered a large FoodSaver brand vacuum sealer similar to the one found in Robinson's checked bag. TFO Doyle also found several vacuum sealer bags and several United States Postal Service mailing envelopes.

38. When asked why he had these items in his checked luggage, Messer did not respond.

39. Based on his training and experience, TFO D'Orazio suspected that Messer was involved in illegal narcotics activity. TFO D'Orazio advised Messer that it was quite clear to him what Messer was doing and advised Messer to be careful. Messer admitted to selling marijuana, but stated he only sells a small amount. Based on his training and experience, TFO D'Orazio responded to Messer that he wouldn't need the supplies he had for a small amount of marijuana. Messer nodded his head but did not say anything else.

40. Following the interviews, Messer and Robinson did not board the flight and left the area together.

41. Following their consensual encounter with Robinson and Messer, the investigators returned to the DEA's airport office and requested assistance from Columbus Regional Airport Authority Police K-9 Officer Dale Beam ("Officer Beam") and K-9 "TRex," who are trained and certified in the State of Ohio, to conduct narcotic detection K-9 sniffs at the DEA's airport office on boxes that contained the currency seized from Robinson's bags.

42. The seized currency was placed in new United States Postal Service Priority Mail medium flat rate boxes ("USPS box") and sealed. The narcotic detection K-9 sniff consisted of four separate K-9 sniffs as follows.

    a. Ten USPS medium flat rate boxes were placed in a circle in the DEA office. Three of the USPS boxes were empty, and seven contained shredded,

circulated and un-circulated currency.  Officer Beam and K-9 TRex entered the area, and Officer Beam gave K-9 TRex the command to search.  K-9 TRex did not show a change in behavior in the room or on the ten USPS boxes.  Officer Beam and K-9 TRex then left the area.

      b.      The DEA officers replaced one of the USPS boxes with one of the USPS boxes that contained money seized from Robinson's bags.  The location of the money was unknown to Officer Beam.  Officer Beam and K-9 TRex returned to the area, and Officer Beam gave K-9 TRex the command to search.  While searching, K-9 T-Rex showed a change of behavior on one of the USPS boxes, that is, his breathing quickened, and he stopped quickly at the USPS box.  K-9 T-Rex then placed his front paws on top of the USPS box and began to scratch the USPS box, indicating a positive alert for the odor of narcotics on the USPS box.  The DEA officers advised Officer Beam that it was the USPS box containing money seized from Robinson's bags.

      c.      After the first alert, the original ten USPS medium flat rate boxes were again placed in a circle in the DEA office.  As before, three of the USPS boxes were empty, and seven contained shredded, circulated and un-circulated currency.  Officer Beam and K-9 TRex entered the area, and Officer Beam gave K-9 TRex the command to search.  K-9 TRex did not show a change in behavior in the room or on the ten USPS boxes.  Officer Beam and K-9 TRex then left the area.

      d.      The DEA officers again entered the area and replaced one of the USPS boxes with the other USPS box that contained money seized from

10

Robinson's bags. The location of the money was unknown to Officer Beam. Officer Beam and K-9 TRex returned to the area, and Officer Beam gave K-9 TRex the command to search. While searching, K-9 T-Rex showed a change of behavior on one of the USPS boxes, that is, his breathing quickened, and he stopped quickly at the USPS box. K-9 T-Rex then placed his front paws on top of the USPS box and began to scratch the USPS box, indicating a positive alert for the odor of narcotics on the USPS box. The DEA officers advised Officer Beam that it was the USPS box containing money seized from Robinson's bags.

43. One of the K-9 sniffs described a positive K-9 alert for narcotics on the USPS box containing Defendant 1, $15,104.00 in United States Currency.

44. The other K-9 sniff described the positive K-9 alert for narcotics on the USPS box containing Defendant 2, $10,512.00 in United States Currency.

45. An official count of the United States currency seized from Robinson's carry-on backpack revealed that it totaled $15,104.00 (Defendant 1):

| Denomination | Quantity | Total |
|---:|---:|---:|
| $100 | 44 | $4,400.00 |
| $50 | 15 | $750.00 |
| $20 | 497 | $9,940.00 |
| $10 | 0 | $0.00 |
| $5 | 2 | $10.00 |
| $1 | 4 | $4.00 |
|  |  | $15,104.00 |

46. An official count of the United States currency seized from Robinson's checked luggage revealed that it totaled $10,512.00 (Defendant 2):

11

| Denomination | Quantity | Total |
|---:|---:|---:|
| $100 | 0 | $0.00 |
| $50 | 10 | $500.00 |
| $20 | 500 | $10,000.00 |
| $10 | 1 | $10.00 |
| $5 | 0 | $0.00 |
| $1 | 2 | $2.00 |
| | | $10,512.00 |

47. On January 26, 2023, the DEA received an initial valid administrative claim from Robinson in which she asserted an ownership interest in $25,000.00 in United States Currency that she claimed was seized from her at the CMH on January 10, 2023. On March 6, 2023, the DEA received a second administrative claim from Robinson in which she asserted an ownership interest in a total of $25,616.00 in United States Currency (the defendants). In her claims, Robinson asserts that the seized currency belongs to her and that she is the owner of the seized currency. No other information or documents were included in support of her administrative claims.

48. Finally, investigators have received and reviewed State of Ohio tax information for Robinson which indicates that Robinson did not file any State of Ohio tax returns in 2019 or 2021. On her 2020 return, Robinson claimed a federal adjusted gross income of $9,003.00 and her State of Ohio Employer Wage Summary identified 6 employers in 2020 with a total of $10,272.23 in wages.

49. Based on the foregoing facts, the United States asserts that the defendants, $15,104.00 in United States Currency (Defendant 1) and $10,512.00 in United States Currency (Defendant 2), represent property furnished or intended to be furnished in exchange for a controlled substance, represent proceeds traceable to such an exchange, or were used or intended to be used to facilitate any violation of 21 U.S.C. § 841 or a conspiracy to commit such offense, in violation of 21 U.S.C. § 846. Therefore, the defendants are subject to forfeiture to the United States under 21 U.S.C. § 881(a)(6).

## **CLAIM FOR RELIEF**

WHEREFORE, the plaintiff respectfully requests that:

(a) pursuant to Rule G(3)(b)(i), Supplemental Rules, the Clerk issue a warrant of arrest *in rem*, directing the United States to arrest and seize the defendants and to retain the same in its custody subject to further order of the Court;

(b) the Court, pursuant to Rule G(4), Supplemental Rules, direct the United States to give notice to all persons and entities having an interest in the defendants to assert, in conformity with the law, a statement of any interest they may have, including notice by publication on the official government website, www.forfeiture.gov, for 30 consecutive days;

(c) the forfeiture of the defendants to the United States be confirmed, enforced, and ordered by the Court;

(d) the Court thereafter order the United States to dispose of the defendants as provided by law; and

(e) the Court award the United States all other relief to which it is entitled, including the costs of this action.

        Respectfully submitted,

        KENNETH L. PARKER
        United States Attorney

        s/William B. King II
        WILLIAM B. KING II (0094046)
        Assistant United States Attorney
        Attorney for Plaintiff
        221 East Fourth Street, Suite 400
        Cincinnati, Ohio 45202
        (513) 684-3711
        Bill.King@usdoj.gov

## **VERIFICATION**

I, Jonathan C. Hanley, hereby verify and declare under the penalty of perjury that I am a Special Agent with the Drug Enforcement Administration, that I have read the foregoing Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the complaint are true to my own knowledge, except those matters stated to be alleged on information and belief and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, and my investigation of this case.

I hereby verify and declare under the penalty of perjury that the foregoing is true and correct.

4-27-2023
Date

JONATHAN C. HANLEY, Special Agent
Drug Enforcement Administration